**FOR PUBLICATION**

**FILED**

JAMES J. WALDRON, CLERK

**APRIL 10, 2007**

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  s/ Ronnie Plasner, DEPUTY

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>**MIRIAM R. BURSZTYN**<br>**a/k/a MIRIAM R. PACHT BURSZTYN**<br>**a/k/a MIRIAM PACHT**,<br><br>Debtor. | Case No.:  05-52541 (DHS)<br><br>Adversary No.  06-01496 (DHS)<br><br>Judge:  Donald H. Steckroth, U.S.B.J. |
| **CATHERINE E. YOUNGMAN,**<br>**CHAPTER 7 TRUSTEE FOR**<br>**MIRIAM R. BURSZTYN,**<br><br>Plaintiff,<br><br>v.<br><br>**MIRIAM R. BURSZTYN,**<br><br>Defendant. | |

**OPINION**

**APPEARANCES:**

Scarpone Staiano & Savage, LLC
Patricia A. Staiano, Esq.
James J. Savage, Esq.
744 Broad Street, Suite 1901
Newark, New Jersey 07102
***Counsel for Catherine E. Youngman,
Chapter 7 Trustee***

Law Offices of Douglas T. Tabachnik
Douglas T. Tabachnik, Esq.
37 Greenleaf Drive
Manalapan, New Jersey 07726
***Counsel for Miriam R. Bursztyn,
Defendant***

## THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE

Before the Court is an "order to show cause with *ex parte* relief authorizing the bankruptcy trustee's entry into and inspection of debtor/defendant's residence to search, seize and appraise estate property."  Also before the Court is a request by Miriam R. Bursztyn, the Chapter 7 Debtor (hereinafter "Debtor"), to suppress the evidence obtained by the Trustee in violation of the Debtor's Fourth Amendment rights.[1]  For the reasons that follow, the order to show cause filed by Catherine E. Youngman, as Chapter 7 Trustee for the Debtor (hereinafter "Trustee") is hereby granted, and the Debtor's application to suppress the "evidence" obtained by the Trustee during her search of the Debtor's residence is denied.

The proceeding before the Court is a matter of first impression within this District and involves significant issues regarding the intersection of a bankruptcy trustee's statutory duties under the Bankruptcy Code and the application of the Fourth Amendment to the United States Constitution.  Few reported decisions in other jurisdictions have addressed this issue.  Due to the significance of the issues involved, an extensive recitation of the facts is warranted, despite the Debtor's concession that "[t]he essential facts of this case are undisputed."  (*See Sur-reply Certification and Brief in Opposition to the Trustee's Motion for an Order Authorizing the Trustee's Entry into and Inspection of the Debtor/Defendant's Residence to Secure and Appraise Estate Property*, ¶ 2) (hereinafter "*Debtor Sur-reply*").

---

[1] The relief sought by the Debtor is styled as a "request" because the Debtor did not file a formal motion to suppress the evidence obtained by the bankruptcy Trustee during her search of the Debtor's residence.  Rather, the Debtor argued as part of her opposition to the Trustee's motion for an *ex parte* order that the evidence should be suppressed.

I.      **Statement of Facts and Procedural History**

On October 14, 2005, the Debtor filed a voluntary petition under Chapter 7 of the

Bankruptcy Code.  The Debtor was represented by counsel at the time of filing.  On October 31,

2005, Catherine E. Youngman was appointed as the Chapter 7 Trustee for the Debtor's bankruptcy

estate.

Several averments made by the Debtor in her bankruptcy petition are significant to the issues

before the Court.  The Debtor listed her residence as 21 Grand Cove Way, Edgewater, New Jersey.

On Schedule B of her bankruptcy petition,[2] the Debtor listed her personal property as: "Checking

account Bank of America" in the sum of $350.00; "Ordinary household goods" valued at $1,000.00;

"Ordinary clothing" valued at $300.00; "Misc. and costume jewelry" valued at $135.00; a contingent

claim against the pension of her former husband, Enrique M. Bursztyn, in the amount of $175,000;

a 1993 BMW automobile "purchased for $500.00 for son's use" valued at $500.00; and a 2001

Mercedes E320 automobile valued at $23,350.00.  The Debtor noted "None" on Schedule B with

respect to whether she owned any "pictures and other art objects."  Based upon the foregoing

valuations, the Debtor approximated her total assets at $200,635.00.  The Debtor listed her total

liabilities at $193,966.90.  The Debtor acknowledged and declared under penalty of perjury that the

representations made on her bankruptcy schedules were "true and correct to the best of [her]

knowledge, information, and belief."

Moreover, on her Statement of Financial Affairs, the Debtor answered "None" to each and

every one of the following inquiries: (1) "[d]escribe all property that has been attached, garnished

or seized under any legal or equitable process within one year immediately preceding the

_____

[2] Schedule B requires an individual debtor to disclose all of his or her personal property.

4

commencement of this case"; (2) "[l]ist all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within one year immediately preceding the commencement of this case"; (3) "[d]escribe any assignment of property for the benefit of creditors made within 120 days immediately preceding the commencement of this case"; (4) "[l]ist all gifts or charitable contributions made within one year immediately preceding the commencement of this case"; (5) "[l]ist all losses from fire, theft, other casualty or gambling within one year immediately preceding the commencement of this case or since the commencement of this case"; (6) "[l]ist all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case"; and (7) "[l]ist each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within one year immediately preceding the commencement of this case."  Again, the Debtor certified under penalty of perjury to the accuracy of the responses in her Statement of Financial Affairs.

During the course of the Trustee's investigation into the Debtor's financial affairs, the Trustee obtained two written judicial decisions rendered in the Debtor's state court divorce proceedings that, according to the Trustee, belied the Debtor's disclosures on her bankruptcy petition and accompanying Schedules and Statement of Financial Affairs.  (*Trustee Catherine E. Youngman's Declaration in Support of Ex Parte Motion for an Order Authorizing the Trustee's Entry into and Inspection of Debtor/Defendant's Residence to Secure and Appraise Estate Property*, ¶¶ 7, 10) (hereinafter "*Trustee Decl.*").  These two judicial decisions catalyzed the Trustee's further investigation and application to this Court for an *ex parte* order to search the Debtor's residence.

Due to their significance, the two state court decisions will be discussed in detail.  The following additional facts derive from the state court judicial decisions.

The Debtor and Enrique M. Bursztyn married on November 25, 1982, and two children were born during their almost twenty-year marriage.  (*Bursztyn v. Bursztyn*, FM-02-2235-00 (N.J. Super. Ct. Ch. Div. Oct. 18, 2002), *Trustee Decl.*, Exhibit "C").  In March of 2000, prior to the parties' separation, the Debtor filed a complaint for divorce against her husband in the Superior Court of New Jersey.  (*Id.*).  The divorce action was tried before the Honorable Robert C. Wilson, J.S.C., who issued a written decision on October 18, 2002.  The written decision issued by the trial court granted the parties a divorce and addressed the contested issues of custody, child support, spousal support, equitable distribution, tax liabilities, and counsel fees.  (*See generally id.*).

On the issue of the equitable distribution of marital assets and after hearing extensive testimony regarding the valuation with respect to the jewelry and artwork purchased by the parties during the marriage, Judge Wilson held that:

> [t]he current market value of these items could not be determined as [the Debtor] claims they were missing, but no insurance or police report was ever filed concerning this alleged loss. The Court concludes that the [Debtor] has retained them.  Some of these items she purchased after having secretly consulted counsel about a divorce two years prior to her filing a complaint against [her husband].
>
> The [Debtor] also has retained the parties' art collection.  The art is composed of lithographs, photographs, and original paintings by various artists.  The appraisal of these items was not accomplished.

(*Id.*).  Judge Wilson then held that the jewelry and artwork had a combined value of $125,000 and credited the total amount to the Debtor for purposes of equitable distribution.  (*Id.*).

6

Judge Wilson also noted that during the divorce proceeding, the Debtor "constantly violated Court Orders, changed counsel, retained needless experts, and generally obstructed the litigation process on numerous occasions." (*Id.*).

Both parties appealed the decision rendered by the trial court. The New Jersey Superior Court, Appellate Division issued a lengthy and detailed written decision approximately three months prior to the petition date. While the Appellate Division affirmed the lower court decision in all respects, the opinion is significant to the Trustee's application before this Court because of its blistering critique of the Debtor's conduct during the course of the divorce proceeding. (*Bursztyn v. Bursztyn*, A-3169-02T1 (N.J. Super. Ct. App. Div. Jul. 22, 2005), *Trustee Decl.*, Exhibit "B"). The appellate decision is discussed in some detail to provide a complete picture of the confluence of facts confronting the Trustee prior to the request for *ex parte* relief to search the Debtor's residence.

During their marriage, and especially in the years leading up to their divorce, the parties' lifestyle far exceeded their means. (*Id.*). For example, the parties paid chauffeurs to drive their sons to separate private schools each day. (*Id.*). Mr. Bursatyn estimated the total educational expenses between $60,000.00 and $80,000.00 per year. (*Id.*). The parties also hosted extravagant Bar Mitzvahs for their sons. They spent approximately $95,000.00 for one Bar Mitzvah at the Waldorf Astoria Hotel. (*Id.*). They spent approximately $77,500.00 for a Bar Mitzvah for their second child. (*Id.*). The parties regularly took expensive family vacations and paid for one son's trips to Europe, Israel, and the Caribbean, as well as for both sons to attend sleep-away camps. (*Id.*).

The family also retained extensive domestic help year-round, including a live-in housekeeper, a landscaper, a piano tuner, a gardener, a carpet cleaner, a window washer and a

7

drapery cleaner.  (*Id.*).  In addition, the parties employed kitchen staff during high holidays.  (*Id.*).

They also spent large amounts on personal items.  Over the course of two years, they wrote in excess

of $343,000.00 in checks from a single bank account, of which $134,000.00 was used to purchase

fine jewelry.  (*Id.*).  Over three years in the same time frame, the parties also charged over

$139,000.00 on their credit cards.  (*Id.*).  Lastly, they also leased two luxury vehicles which were

replaced at least every four years.  (*Id.*).

The family's income was insuffiicent to support these spending habits.  In order to finance

the purchases in excess of their income, the parties: (1) chose not to pay their full income tax

obligations; (2) wrote personal checks from Mr. Bursztyn's business account; (3) took loans from

his medical practice; (4) made extensive charges on their numerous credit cards; (5) took a home

equity loan on their residence; (5) cashed in Mr. Bursztyn's life insurance policy; (6) and took

distributions from his profit sharing plan.  (*Id.*).  Their only savings was the remainder of Mr.

Bursztyn's profit sharing plan.  (*Id.*).

The Appellate Division found that during the marriage, Mr. Bursztyn had given the Debtor

several expensive pieces of jewelry.  (*Id.*).  Significantly, the Debtor testified at trial that she was

no longer in possession of any of the jewelry and claimed she had not seen the jewelry since June

of 2000, when Mr. Bursztyn left the marital residence after her bedroom had been "ransacked."

(*Id.*).  At trial, the husband testified that when he vacated the marital home, the only piece of jewelry

he took with him was a watch valued at a few hundred dollars.  (*Id.*).

Prior to trial, the husband requested of the Debtor's counsel that the jewelry be appraised and

filed several motions to compel appraisal.  (*Id.*).  The Debtor opposed any request for appraisal.

(*Id.*).  In so doing, the Debtor <u>never</u> alleged that the jewelry was lost or stolen, and <u>never</u>

cross-moved for a return of the jewelry. (*Id.*). In no less than four separate pretrial orders, the trial

court ordered that the jewelry be appraised. (*Id.*). The parties had also acquired several pieces of

artwork, including lithographs by Francisco Zuniga, photography by Alfred Eisenstadt, and a signed

poster by Peter Max. (*Id.*).

The Appellate Division then reviewed Judge Wilson's valuation of the jewelry and artwork

and his finding that the value of those items were credited to the Debtor's share in equitable

distribution. (*Id.*). Quite significantly, the Appellate Division stated that:

> [t]he trial court explicitly rejected [the Debtor's] contention that the
> jewelry had been lost or stolen. The court believed instead that [she]
> was in possession of the jewelry and lying about the jewelry's
> whereabouts.

(*Id.*). The Appellate Division then held that the Debtor's argument on appeal as to valuation

contained no merit. The $125,000.00 estimated value of the jewelry "was the best the trial court

could accomplish. The jewelry could not be appraised because [the Debtor] refused to produce it

for appraisal." (*Id.*).

The Appellate Division also characterized the Debtor as an obstructionist in her litigation

tactics and noted her "disregard for the authority of the court." (*Id.*).

> [T]hroughout the litigation, [the Debtor] was uncooperative with her
> own counsel, [her former husband's] counsel, and the court. As such,
> [she] was responsible for much of the litigation delay and motion
> practice. For example, during the more than two years of pretrial
> litigation, [the Debtor] attended only two meetings with [her former
> husband] and his counsel relating to the divorce, and she attended
> those meetings only because the court ordered her to do so. Also,
> [the Debtor] did not respond to [her former husband's] pretrial
> settlement proposals.

In addition, [the Debtor]: (1) refused to return [her former husband's] computer until the court ordered its return; (2) violated a court order compelling her to cooperate in the sale of the marital home;[3] (3) violated a court order compelling her to meet with an employability expert; (4) sat for a deposition only after it was ordered by the court; (5) violated a court order requiring her to return the leased Mercedes; and (6) refused [her former husband's] request for their [bank records], requiring [her former husband] to subpoena the records at a cost of $1,200.  As the trial judge stated,

> '[the Debtor's] belligerence is evident from the trial record. [The Debtor] was a difficult witness who, notwithstanding repeated admonitions from the court, was argumentative with counsel and did not answer the question asked.'

(*Id.*) (quoting *Bursztyn v. Bursztyn*, FM-02-2235-00 (N.J. Super. Ct. Ch. Div. Oct. 18, 2002), *Trustee Decl.*, Exhibit "C").

According to the Trustee, "[t]he findings of the Appellate Division, the Family Court, and my investigation to date [gave] me good and probable cause to believe that [the] Debtor failed to disclose estate property on her petition, specifically fine jewelry and art, and that [the] Debtor still maintains this property at her residence."  (*Trustee Decl.*, ¶ 13).  Based upon this conclusion, the Trustee applied to the Court, on an *ex parte* basis, for an order authorizing her to enter the Debtor's residence to inspect and obtain the jewelry and artwork that constitutes property of the estate under Section 541 of the Bankruptcy Code.[4]  In support of the application, the Trustee filed a "Verified

---

[3] The trial court ultimately had to appoint a lawyer to execute documents on the Debtor's behalf with respect to the ordered sale of the marital home.

[4] Section 541(a)(1) of the Bankruptcy Code provides that:

> [t]he commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all the following property, wherever located and by whomever held:
>
>> (1)    Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the

Complaint for Turnover of Assets, Replevin and Objecting to Discharge" (hereinafter "Complaint"),

a declaration,[5] and a legal memorandum.[6]

The Trustee's grounds for seeking an order of inspection and seizure on an *ex parte* basis

included: (1) the Debtor's repeated and unjustified refusal to turn the jewelry and artwork over for

appraisal despite numerous court orders; (2) her frequent violations of discovery orders; (3) her

disregard for the entirety of the judicial process; (4) her dishonesty in identifying the property's

whereabouts; and (5) her failure to list the items on her petition as currently in her possession or

transferred therefrom within one year pre-petition.  (*Trustee Decl.*, ¶¶ 22-23, 26).[7]  These grounds,

many confirmed by findings of the Appellate Division and the trial court, gave the Trustee, in her

opinion, good cause to believe the Debtor would attempt to hide or dispose of the art and jewelry.

The Trustee's Complaint sets forth the underlying factual predicate and asserts four counts

against the Debtor.   Count One asserts a cause of action for turnover of property of the estate

pursuant to Section 542(a) of the Bankruptcy Code, premised upon the Debtor's alleged failure to

---

commencement of the case.

11 U.S.C.A. § 541(a)(1) (West 2007).

[5] As exhibits to her declaration, the Trustee attached copies of the Debtor's bankruptcy petition and the written decisions of the state trial court and the New Jersey Superior Court, Appellate Division.

[6] At the direction of the Court, the Trustee was allowed to file these documents under seal.

[7] In requesting the assistance of the United States Marshal, the Trustee agreed to assume responsibility for the safekeeping and maintenance of any jewelry and artworks found at the Debtor's residence.  Furthermore, in her capacity as trustee on behalf of the bankruptcy estate, the Trustee agreed to hold harmless the United States Marshal Service and its employees "from any and all claims asserted in any court or tribunal, arising from the acts, incidents or occurrences in connection with the seizure and possession of the Debtor's property, including any third-party claims."  (*Trustee Decl.*, ¶ 30).  Finally, in consideration for the United States Marshal Service's consent to the substitution of custody, the Trustee agreed to "indemnify, hold harmless, and release the United States Marshal, the United States of America, their agents, servants, employees, and all other for whom they are responsible, from any and all liability and responsibility arising out of the care and custody of the property, from the date of the transfer of the property."  (*Id.* at ¶ 31).

11

disclose assets that comprise property of the bankruptcy estate.  (*See Complaint*, ¶¶ 31-33).  Count Two outlines a cause of action under New Jersey's replevin statute, N.J. STAT. ANN. 2B:50-1 (West 2007).  Accordingly, "the Trustee [alleges that she] is entitled to possession of the assets of the estate wrongfully held by the Debtor. . . ." (*Id.* at ¶ 36).  Count Three of the Complaint asserts a cause of action for the denial of the Debtor's discharge under Section 727(a) of the Bankruptcy Code.  (*Id.* at ¶¶ 37- 40).

In Count Four of the Complaint, the Trustee sought a preliminary injunction with *ex parte* relief.  She argued that the jewelry and artwork became property of the bankruptcy estate upon commencement pursuant to Section 541 of the Bankruptcy Code.  (*Id.* at ¶¶ 42-44).  The Trustee went so far as to itemize eight pieces of jewelry, indicating their retail value at $124,290.  (*Id.* at ¶ 43).  The Trustee alleged that the Debtor was under an obligation to deliver those items to the Trustee as required by Section 542 and that Section 704 imposes a duty upon the Trustee to collect and liquidate property of the estate.  (*Id.* at ¶¶ 45-46).

The Trustee's request for issuance of an *ex parte* writ of replevin was made pursuant to the Court's inherent powers under Section 105 and *ex parte* relief provision New Jersey's replevin statute, N.J. STAT. ANN. 2B:50-3 (West 2007).  (*Id.* at ¶¶ 47-49).  As the basis for cause, the Trustee relied upon the extraordinary facts of this case, the Debtor's willingness to conceal assets in contravention of and disregard for court order, the clear and present danger of dissipation of the assets given their size, and the attendant harm to the bankruptcy estate.  (*Id.* at ¶¶ 49-53).

Ultimately, the Trustee sought an *ex parte* order and preliminary injunction authorizing her to enter the Debtor's residence with the assistance of the United States Marshal's Service, her

counsel, and an appraiser to search for, seize, and appraise estate property located within the residence.

After scrutinizing the application filed by the Trustee, the Court entered an "Order to Show Cause with *Ex Parte* Relief Authorizing the Trustee's Entry into and Inspection of Debtor/Defendant's Residence to Search, Seize and Appraise Estate Property" (hereinafter "Order"). The Order authorized the Trustee, her counsel, an appraiser, and representatives of the United States Marshal Service to enter the Debtor's residence, as listed on her petition, within ten days of its entry and between the hours of 8:00 a.m and 6:00 p.m. (*Order*, ¶ 6). The Order's scope encompassed fine jewelry and the Debtor's art collection, consisting of "lithographs, photographs and original paintings." (*Id.*). The Trustee was authorized to search for, seize and appraise the uncovered assets. (*Id.*). The Order permitted the Trustee to photograph the property seized and required her to account for the property within two days of the search by providing an inventory to the Debtor, the Debtor's counsel and the United States Marshal, to be included in his return to the Court. (*Id.* at ¶¶ 8-9). The pieces of jewelry itemized in the Order are the same pieces described in the Trustee's Adversary Complaint, her declaration in support of the Order and the opinion of the New Jersey Superior Court, Appellate Division. (*Complaint*, ¶ 43; Order, ¶ 6; *Bursztyn v. Bursztyn*, A-3169-02T1 (N.J. Super. Ct. App. Div. Jul. 22, 2005), *Trustee Decl.*, Exhibit "B").

On the morning of March 14, 2006, the United States Marshals Service, accompanied by the Trustee, her counsel, and appraiser personally served the Order upon the Debtor at her residence. (*Trustee/Plaintiff Catherine E. Youngman's Declaration in Reply to the Opposition of Defendant Miriam R. Bursztyn and in Further Support of Ex Parte Motion for an Order Authorizing the Trustee's Entry into and Inspection of Debtor/Defendant's Residence to Secure and Appraise Estate*

*Property*, ¶ 2) (hereinafter "*Trustee Reply Decl.*").  As required by the Order, counsel for the Trustee

faxed a copy of the Order and supporting papers to the Debtor's counsel immediately after entering

the Debtor's residence.  (*Id.* at ¶ 3).  Upon entering the Debtor's residence, the Marshals asked the

Debtor "at least four times" whether she, in fact, possessed the items outlined in the Order.  (*Id.* at

¶ 4).  The Debtor repeatedly denied possessing the items.  (*Id.*).

> 6.    After [the Debtor] denied that she had the items, we
> proceeded to her bedroom on the second floor of the house.
> I asked [the Debtor] where she kept her jewelry and she
> directed me to a dresser in her bedroom which had numerous
> small jewelry drawers.  The dresser also [had] a great number
> of jewelry boxes on it.

> 7.    I asked [the Debtor] for her wedding rings and she provided
> me with three rings claiming that they represented all of the
> diamonds that she ever had.

> 8.    I started my search there and found that drawers and boxes
> contained numerous pieces of costume jewelry.

> 9.    While I looked through the costume jewelry, [the Debtor] was
> asked to open a locked walk-in closet in her bedroom.  After
> she unlocked it, we discovered more boxes of costume
> jewelry, clothing and miscellaneous merchandise including
> over twenty designer handbags that still had their store tags.

> 10.   We then discovered a black 'fanny pack.'  We opened the
> pack and found that it contained $4,700 in one hundred dollar
> bills.  The bills were in three stacks, each wrapped in a paper
> band marked with a Fleet Bank date stamp from various days
> in July 2003.  The fanny pack also contained keys.

> 11.   We then removed a large suitcase from the bottom of the
> [closet].  The suitcase was quite heavy and we discovered it
> contained a lockbox.  The keys from the fanny pack opened
> the lockbox, which contained numerous pieces of fine
> jewelry.

12. We also removed a laundry bag from the [closet]. We opened the laundry bag to find more boxes of fine jewelry.

13. *The jewelry in the lockbox and laundry bag included the items specified in the Order, which [the Debtor] denied she had*.

14. All of the fine jewelry found in [the Debtor's] home was photographed and inventoried.

15. I also searched the rest of the house for the artwork noted in [the Debtor's] divorce, which was also found and photographed.[8]

(*Id.* at ¶¶ 6-15).

The report subsequently issued by the appraiser for the Trustee is eighteen pages long, and lists the jewelry and artwork found at the Debtor's residence, along with the property's estimated forced sale value. In total, the search uncovered one-hundred-and-eighty-nine (189) pieces of fine jewelry and ten (10) works of art. According to the appraisal, the forced sale value of the jewelry and artwork, taken together, amounts to $242,767.00.[9]

The Debtor subsequently filed an opposition to the Trustee's order to show cause, and the matter was heard by the Court. The gravamen of the Debtor's opposition is that the Order violated the Debtor's constitutional rights under the Fourth Amendment of the United States Constitution. (*See Certification and Memorandum in Opposition to Motion for Temporary and Preliminary Injunctive Relief*, ¶ 1) (hereinafter "*Debtor Opp.*"). Consequently, the Debtor argues that all of the

---

[8] The Trustee gave the Debtor a handwritten receipt at the conclusion of the search and provided the Debtor's counsel with all of the photographs of the property together with a typewritten inventory of the jewelry found at the Debtor's residence. (*Trustee Reply Decl.*, ¶¶ 17-18).

[9] Schedule A, attached hereto, lists the items found in the Debtor's residence.

15

evidence obtained by the Trustee during her search of the Debtor's residence must be suppressed and returned to the Debtor.  (*Id.* at ¶ 34).

In opposing the Trustee's order to show cause, the Debtor's counsel contends that the Trustee's "allegations of the nature of the [Debtor's] conduct in this matter are untrue, or otherwise taken out of context."  (*Id.* at ¶ 2).  However, it is important to note that the Debtor does not contest the facts as presented by the Trustee, nor did the Debtor herself file a certification with the Court opposing the Trustee's order to show cause and in explanation of her own conduct.

According to the statement of the Debtor's counsel, the current circumstances involving the Debtor are very much the result of her troubled state of mind that has resulted from her tortured history.  (*Id.*).  The Debtor's counsel recounts the story that his client's parents were both Orthodox Jews from a small village in Poland, whose property was confiscated in 1938 when Poland was invaded.  The Debtor was born in 1948 in a displaced persons camp in Germany with other refugees.  (*Id.* at ¶ 3).  For years before the Debtor's father was murdered in a holdup of his jewelry store in New York City, it is contended the Debtor was subjected to outbursts of her father's rage as a result of his experiences during the war.  (*Id.* at ¶ 4).  Allegedly, he had imbued the Debtor with the idea that she should not trust any governmental authority, banks, or corporations, "asserting that the world hated Jews and that no one could every really be trusted to protect them or their property."  (*Id.*).  These experiences resulted in the Debtor's hoarding personal possessions and cash.  (*Id.*).

The Debtor contends her ill health and emotional problems caused the disintegration of her first marriage.  (*Id.* at ¶ 5).  Her second marriage to Mr. Bursztyn also ended in divorce, the proceedings of which have been detailed extensively herein.  (*Id.* at ¶ 6).  Those divorce proceedings

were acrimonious and had a further debilitating effect upon her physical and mental health and

stability.  (*Id.* at ¶ 9).[10]

Against this factual and procedural background, the Court will turn to its legal conclusions.


## II.    Discussion

In objecting to the Trustee's order to show cause, the Debtor submits that the search of her

home and the subsequent seizure of the jewelry and artwork "violated [her] Fourth Amendment

rights under the United States Constitution rendering all such articles inadmissible as evidence at

any proceedings against her."  (*Id.* at 7).  The issue of the relationship between the Bankruptcy Code,

and more particularly, a bankruptcy trustee's duty to marshal all non-exempt assets to satisfy the

claims of creditors, and a debtor's constitutional right to privacy against unreasonable searches and

seizures has been rarely addressed by the federal courts.  In fact, to date only one reported decision

has squarely addressed this issue.

The Fourth Amendment to the United States Constitution provides:

> [t]he right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Without doubt, "the central concern of the Fourth Amendment is to protect liberty and

privacy from arbitrary and oppressive interference by government officials."  *U.S. v. Ortiz*, 422 U.S.

---

[10] No medical evidence of the Debtor's alleged stress and disorders was provided to the Court.

891, 895 (1975) (citing *Camara v. Mun. Court of the City & County of San Francisco*, 387 U.S. 523, 528 (1967) (other citation omitted)).   As the text of the Fourth Amendment plainly provides, individuals are protected from an "unreasonable" search or seizure, or both.   Under the Fourth Amendment, a "search" occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed."   *U.S. v. Jacobsen*, 466 U.S. 109, 113-14 n.4 (1984) (citing *see Ill. v. Andreas*, 463 U.S. 765, 771 (1983); *U.S. v. Knotts*, 460 U.S. 276, 280-281 (1983); *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (other citation omitted)).   In turn, a "seizure" of property occurs "when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113-14  n.5 (citing *see U.S. v. Place*, 462 U.S. 696 (1983); *see also Hale v. Henkel*, 201 U.S. 43, 76 (1906) (other citations omitted)).

Moreover, at the very core of the Fourth Amendment "'stands the right of a man to retreat into his own home.'" *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992) (quoting *Silverman v. U.S.*, 365 U.S. 505, 511 (1961) (other citations omitted)).   In other words, "[o]ne's home is sacrosanct, and unreasonable government intrusion into the home is 'the chief evil against which the wording of the Fourth Amendment is directed.'" *U.S. v. Zimmerman*, 277 F.3d 426, 431 (3d Cir. 2002) (quoting *Payton v. N.Y.*, 445 U.S. 573, 585-86 (1980) (quoting *U.S. v. U.S. Dist. Court for the E. Dist. of Mich.*, 407 U.S. 297, 313 (1972))).   Under the facts of the present case, it is clear that a "search" and "seizure," as defined by the United States Supreme Court, occurred.[11]

Consequently, the issues here are whether the Fourth Amendment to the United States Constitution is applicable to a bankruptcy trustee's search and seizure of a debtor's residence and,

---

[11] Notably, the parties do not contest whether a search or seizure occurred.

18

if so, whether the Trustee's conduct in this instance was unreasonable and, therefore, violative of the Debtor's Fourth Amendment rights.

It is fundamental that the protections stemming from the Fourth Amendment to the United States Constitution only proscribe governmental action. *See Jacobsen*, 466 U.S. at 113 (citation omitted). Therefore, the Fourth Amendment is "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official.'" *Id.* at 113-14 n.6 (citing *see U.S. v. Janis*, 428 U.S. 433, 455-56 n.31 (1976); *Coolidge v. N.H.*, 403 U.S. 443, 487 (1971); *Burdeau v. McDowell*, 256 U.S. 465 (1921) (other citations omitted)).

In many cases raising the specter of a possible violation of the Fourth Amendment, a gray area exists between the extremes of overt governmental participation in a search and the complete absence of such participation. *See U.S. v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981) (citation omitted). Without doubt, a bankruptcy trustee executing a court-approved search and seizure order falls within the gray area of this continuum and represents a hybrid between private actor and governmental official. Thus, the first issue to be addressed is whether a bankruptcy trustee is bound by the Fourth Amendment to the United States Constitution.

Section 701 of the Bankruptcy Code provides that shortly after an individual files for bankruptcy protection under Chapter 7, the Office of the United States Trustee (hereinafter "OUST")[12] "shall appoint one disinterested person that is a member of the panel of private trustees established under section 586(a)(1) of title 28" to administer the bankruptcy case. 11 U.S.C.A. §

---

[12] The Attorney General of the United States, an official of the Department of Justice, appoints both the regional United States Trustee as well as any Assistant United States Trustees. *See* 28 U.S.C.A. §§ 581 and 582 (West 2007). In addition, the United States Trustee and any Assistant United States Trustees are subject to removal by the United States Attorney General. *See* 28 U.S.C.A. §§ 581(c) and 582(b) (West 2007).

701(a) (West 2007).   Pursuant to 28 U.S.C. § 586(a)(1), each regional United States Trustee is required to "establish, maintain, and supervise" the panel of private trustees "that are eligible and available" to serve as trustees in cases under Chapter 7 of the Bankruptcy Code.  *See* 28 U.S.C.A. § 586(a)(1) (West 2007).   Further, 28 U.S.C.A. § 586(a)(3) requires the regional United States Trustee to "supervise the administration of cases and [private] trustees in cases under" Chapter 7. 28 U.S.C.A. § 586(a)(3) (West 2007).  The United States Attorney General also "prescribe[s] by rule qualifications for membership on the panels established by United States [T]rustees under" 28 U.S.C. § 586(a)(1).  28 U.S.C.A. § 586(d) (West 2007).  Although panel trustees operate under the direction and supervision of the OUST, the OUST itself considers panel trustees to be "private parties," and not governmental employees.[13]  *See Cromelin v. U.S.*, 177 F.2d 275, 277 (5th Cir. 1949) (stating that a bankruptcy trustee "is in no sense an agent or employee or officer of the United States"), *questioned on other grounds in Sullivan v. U.S.*, 21 F.3d 198, 202-03 (7th Cir. 1994).  In most cases, a panel trustee is ordinarily an attorney or accountant engaged in private practice.

Not only is a panel trustee under the supervision and administration of the OUST, but a trustee is an officer of the court and remains under the supervision and direction of the bankruptcy court during the pendency of a Chapter 7 case.  *See In re Med. Sterile Prods.*, 310 F. Supp. 262, 264 (D.P.R. 1970) ("The powers and duties of a receiver or trustee are prescribed by provisions of the [Bankruptcy] Act, but such officer is not vested with authority to proceed alone.  He [or she] remains under supervision and direction of the court.") (citing *Lincoln Nat'l Life Ins. Co. v. Scales*, 62 F.2d 582 (5th Cir. 1933)); *Cromelin*, 177 F.2d at 277.  Even in his or her private capacity, on occasion courts have extended quasi-judicial immunity to private bankruptcy trustees for actions that are

---

[13] *See* United States Trustee Program, *Chapter 7, 12 & 13 Private Trustee Locator*, http://www.usdoj.gov/ust/eo/private_trustee/locator/index.htm (last visited on March 30, 2007).

functionally comparable to those of judges, namely, those functions that involve "discretionary judgment," because the trustee "is performing an integral part of the judicial process." *See Lonneker Farms, Inc. v. Klobucher*, 804 F.2d 1096, *1097 (9th Cir. 1986) ("Hatley, as a trustee in bankruptcy or an official acting under the authority of the bankruptcy judge, is entitled to derived judicial immunity because he is performing an integral part of the judicial process."); *Curry v. Castillo (In re Castillo)*, 297 F.3d 940, 947 (9th Cir. 2002) (same).

Thus, the duties and oversight of the OUST and the responsibility of being an officer of the court evidence the fact that private bankruptcy trustees possess characteristics of the executive branch, the judicial branch, and of a private party. This presents the issue whether a bankruptcy trustee can seek a search and seizure order from the bankruptcy court in fulfilling his or her duties to collect property of the estate and to investigate the financial affairs of a debtor pursuant to Section 704 of the Bankruptcy Code,[14] and if so, whether a trustee's conduct can be sufficiently attributed to governmental action so as to implicate a debtor's Fourth Amendment privacy interests.

### A.     The Fourth Amendment Is Applicable To And Binds A Chapter 7 Trustee

The Bankruptcy Court for the Eastern District of Michigan's decision in *Barman* is the only reported opinion to have squarely addressed these issues. *Taunt v. Barman (In re Barman)*, 252 B.R. 403 (Bankr. E.D. Mich. 2000). In *Barman*, debtor Norman Barman filed a voluntary petition for Chapter 7 relief. *Id.* at 407. The only asset disclosed on his bankruptcy schedules was wearing

---

[14] Section 704 of the Bankruptcy Code enumerates the essential duties of a bankruptcy trustee in a Chapter 7 case. In pertinent part, Section 704(a)(1) of the Code provides that "[t]he trustee shall -- (1) collect and reduce to money the property of the estate for which such trustee serves. . . ." 11 U.S.C.A. § 704(a)(1) (West 2007). In turn, Section 704(a)(4) contemplates that the bankruptcy trustee "shall -- . . . (4) investigate the financial affairs of the debtor." 11 U.S.C.A. § 704(a)(4) (West 2007).

apparel worth $500.00.  *Id.*  The bankruptcy trustee filed an adversary proceeding against the debtor

and other defendants, contending that the debtor fraudulently transferred money and property away

from the bankruptcy estate and fraudulently concealed assets of the bankruptcy estate.  *Id.*[15]

"Contemporaneous with the filing of the adversary complaint, the trustee filed an *ex parte* motion

for an order authorizing the trustee to enter [the debtor's] residence and to inspect, inventory and

appraise personal property."  *Id.*  The motion detailed the legal and factual grounds for relief, and

was granted by the bankruptcy court.  *Id.*  The trustee thereafter executed the inspection of the

debtor's residence.  Subsequently, the debtor filed a motion to suppress the property found by the

trustee during the search.  *Id.*

In the *ex parte* motion for an order to search the debtor's residence to uncover potential

assets of the bankruptcy estate, the trustee concluded and contended that it was "highly unlikely"

that the debtor's only asset was $500.00 in clothing and noted the "probable existence" of property

of the debtor that was not disclosed on his bankruptcy schedules.  *Id.* at 409.  The trustee explained

the need for an *ex parte* order as follows:

> The Trustee believes that if the Debtor is given advanced warning
> concerning this entry and appraisal of the personal property, then a
> less than full and candid inventory of personal property will occur
> particularly in light of the Debtor's previous violation of a
> bankruptcy court order (temporarily enjoining the Debtor from taking
> any actions related to his property) and his experience in moving
> assets in a variety of situations.

*Id.*

---

[15] The debtor apparently engaged in a scheme to: (1) place beyond the reach of creditors and the bankruptcy
trustee the personal property of his several businesses; and (2) purchase several parcels of real estate in the names of
others to avoid his liability to creditors.  *See In re Barman*, 252 B.R. at 407-08.

With respect to the need to have the United States Marshal's Service accompany him to inspect the debtor's residence, the trustee in *Barman* contended as follows.

> Given the past history of the Debtor's lack of cooperation with respect to bankruptcy proceedings, the Trustee requests that a U.S. Marshal accompany the Trustee, the Trustee's counsel, and the Appraiser employed by the estate during the entry and inventory of the property. Further, the Trustee requests that the Debtor and/or Kimberly Barman[16] instruct the Trustee of any dangerous conditions on the property including the existence of firearms or other similar devices, and also instruct the Trustee about the location of any and all property at the residence that is hidden for safekeeping or for any other purpose. Further, the Trustee requests that the Debtor, Kimberly Barman, or any designated representative assist the Trustee in conducting the inspection and inventory of the personal property.

*Id.* at 410.

The *Barman* court granted the trustee's *ex parte* motion for a search and inspection order based upon:

> the Trustee . . . having shown in the motion and in the accompanying exhibits (including the trustee's affidavit) that immediate and irreparable injury, loss or damage will result should the requested relief not be granted and for the reason that prior notice to the opposing party would result in less than full and candid disclosure of assets and potential harm to the bankruptcy estate. . . .

*Id.*[17]

---

[16] Kimberly Barman was the wife of the debtor, Norman Barman.

[17] The bankruptcy court also made the following observations in granting the trustee's motion:

> (A)    The facts asserted by the [t]rustee that were elicited from sworn testimony of the Debtor and parties associated with the Debtor, specifically allegations related to the likelihood of the Debtor having significantly more assets than the listed five hundred ($500.00) dollars in assets listed in the Debtor's schedules, the Debtor's pattern of having property placed in the names of other people to be held, managed, or otherwise

23

The debtor in *Barman* subsequently filed a motion to suppress evidence obtained by the trustee during his inspection of the debtor's residence grounded in the contention that the inspection violated his Fourth Amendment rights. *Id.* In response, and similar to the circumstances of the present case, the trustee submitted "that he sought the *ex parte* order allowing the inspection because he believed that the debtor would attempt to conceal assets at the home if given advance notice." *Id.* at 411.

The first issue addressed by the *Barman* court was "whether a bankruptcy trustee's inspection of a debtor's residence to look for estate assets is fairly attributable to the government or to private interests." *Id.* at 412. Considering a bankruptcy trustee's oversight by both the OUST and the court, including the extension of derived judicial immunity to bankruptcy trustees under certain conditions, the *Barman* court held that "the statutory provisions relating to the trustee's status . . . suggest a relationship sufficiently close to the government that the Fourth Amendment applies, even though the trustee is not technically an employee of the government." *Id.* Although a "private" actor, "every aspect of a trustee's position and function is subject to either statutory obligation or to federal executive or judicial branch control." *Id.* Consequently, the *Barman* court concluded "that these circumstances surrounding the status and function of a trustee in a Chapter 7 case all

---

administered, and the difficulty in discovering or tracing assets in the video/vending machine business are factors that show the high potential of irreparable harm and the damage to the bankruptcy estate that may not be detected absent granting the relief requested; and

(B)   The factors listed above, combined with the Debtor's previous disregard of orders of the bankruptcy court related to the disposition of property controlled by the Debtor . . . are factual allegations that support the granting of the relief requested which includes the issuance of a temporary injunction.

*In re Barman*, 252 B.R. at 410.

suggest a sufficient nexus to the government and its power that it is necessary and appropriate to apply to the trustee the Fourth Amendment limits on government power."[18]  *Id.* at 412-13; *see also In re Skinner*, 336 B.R. 316, 317 (Bankr. N.D. Ohio 2005) ("The case law is clear that a trustee cannot search a debtor's residence for estate property without satisfying the Fourth Amendment to the [United States] Constitution.") (citations omitted); *but see Cromelin*, 177 F.2d at 277 (holding that a bankruptcy trustee "is in no sense an agent or employee or officer of the United States")*; Wells v . U.S.*, 98 B.R. 806, 810 (N.D. Ill. 1989) ("For one thing, a trustee in bankruptcy has long been held *not* to be an agent of the United States.") (citation omitted) (emphasis in original); *In re Application of Tr. in Bankr. for a Search Warrant to Undercover Prop. of the Estate Held in Violation of 18 U.S.C. § 152*, 173 B.R. 341, 342 (N.D. Ohio 1994) (holding that a bankruptcy trustee is neither a "federal law enforcement officer" nor an "attorney for the government" for purposes of obtaining a search warrant pursuant to Federal Rule of Criminal Procedure 41) (citation omitted); *In re Kerlo*, 311 B.R. 256, 265 (Bankr. C.D. Cal. 2004) (holding that a bankruptcy trustee is subject to the Fourth Amendment *only* if "(1) the government knew of and acquiesced in the [trustee's] conduct and (2) the trustee acted with the intent to assist the government in its investigatory or administrative purposes.") (citation omitted) (emphasis added).

While authority exists to hold that a bankruptcy trustee is a private actor and not an agent or instrumentality of the government for purposes of the Fourth Amendment, in instances where the trustee is carrying out his or her functions under the Bankruptcy Code to investigate the financial

---

[18] In addition, the Order provided for the assistance of the U.S. Marshal's Service and "[s]uch 'participation would establish both state action and action under color of state law.'"  *In re Barman*, 252 B.R. at 413 n.6 (quoting *Howerton v. Gabica*, 708 F.2d 380, 382-85 (9th Cir. 1983) (Action taken by landlord was "under color of state law" where actions of police officer in accompanying landlord when serving eviction notice and in privately approaching tenants and recommending that they leave created appearance that police sanctioned eviction.)).

affairs of the Debtor and maximize available assets for distribution to creditors, the Court is not prepared to conclude that a bankruptcy trustee is free from the strictures of the Fourth Amendment and forfeit a debtor's expectations of privacy.  As such, and following the lead of *Barman*, this Court concludes that the position, status, and function of a bankruptcy trustee evidences a sufficiently close nexus to governmental action that it is appropriate to apply Fourth Amendment limitations to a trustee's conduct in seeking an order to search a debtor's residence and seize hidden, undisclosed assets belonging to the bankruptcy estate.

### B.      The "Reasonableness" Standard Applies To Bankruptcy Trustees

Having concluded that a bankruptcy trustee is bound by the Fourth Amendment, the issue becomes the appropriate standard applicable to bankruptcy trustees under the Fourth Amendment. As previously noted, the parties do not dispute the notion that the Debtor had a legitimate expectation of privacy in her residence to be free from unreasonable searches and seizures.

As the United States Supreme Court announced in *T.L.O.*, "[t]he fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required.'"  *N.J. v. T.L.O.*, 469 U.S. 325, 340-41 (1985) (citation omitted).  Rather, the United States Supreme Court has in a number of cases, particularly in the civil context, recognized that "[w]here a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard."

*Id.*[19]  "Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place." *Id.* at 337.  Under Fourth Amendment jurisprudence, whether a search is reasonable depends upon the totality of the circumstances. *See Samson v. Cal.*, 126 S. Ct. 2193, 2197 (2006) (citing *U.S. v. Knights*, 534 U.S. 112, 118 (2001) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1966))).  "The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.'" *T.L.O.*, 469 U.S. at 337 (quoting *Camara*, 387 U.S. at 536-37).  Thus, whether a search is reasonable is "determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Knights*, 534 U.S. at 118-19 (quoting *Wyo. v. Houghton*, 526 U.S. 295, 299-300 (1999)); *see T.L.O.*, 469 U.S. at 337; *Samson*, 126 S. Ct. at 2197 (citation omitted).  Moreover, "[a]lthough incursions on the Fourth Amendment should be guarded jealously, not infrequently the ordinary requirements of the Fourth Amendment are modified to deal with special circumstances." *Tarter v. Raybuck*, 742 F.2d 979, 981-82 (6th Cir. 1984) (citing *see, e.g.*, *Marshall*, 436 U.S. at 107; *Terry*, 392 U.S. at 1;

---

[19] For example, the Supreme Court has determined that the appropriate standard for administrative searches is not probable cause.  "Instead, an administrative warrant can be obtained if there is a showing that reasonable legislative or administrative standards for conducting an inspection are satisfied." *O'Connor v. Ortega*, 480 U.S. 709, 722-23 (1987) (citing *see Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978); *Camara*, 387 U.S. at 538).

*Camara*, 387 U.S. at 523).[20]  In assessing the degree of intrusion a search of a residence would have upon a debtor's expectation of privacy, the *Barman* court observed as follows.

> Fundamentally, it is clear that compared to other people who have not filed for bankruptcy relief, a debtor who has filed for bankruptcy relief must have a significantly reduced expectation of privacy in his [or her] 'houses, papers, and effects' that society is prepared to

---

[20] The circumstances of this case present such a special circumstance.  In a typical case, prior to searching an individual's residence and seizing any illicit property contained therein a search warrant must be obtained in accordance with Federal Rule of Criminal Procedure 41.  In fact, the Debtor in this case contends that the Trustee's conduct violated the Fourth Amendment because she failed to comply with Federal Rule of Criminal Procedure 41. (*See Debtor Opp.*, pp. 11-15).  However, by its own terms Federal Rule of Criminal Procedure 41 does not apply to a bankruptcy trustee in the context of a civil search and seizure order whereby the trustee is attempting to uncover property of the bankruptcy estate intentionally hidden or undisclosed by the debtor for liquidation and distribution to creditors in accordance with the Bankruptcy Code.  Federal Rule of Criminal Procedure 41(b)(1) provides in pertinent part that: "*[a]t the request of a federal law enforcement officer or an attorney for the government*: (1) a magistrate judge with authority in the district -- or if none is reasonably available, a judge of a state court of record in the district -- has authority to issue a warrant to search for and seize a person or property located within the district. . . ."  FED. R. CRIM. P. 41(b)(1) (emphasis added).  While the Court concludes today that a bankruptcy trustee has a sufficient nexus to the government for purposes of the Fourth Amendment, it is clear that a bankruptcy trustee is not an attorney employed by or representing the government.  Further, Federal Rule of Criminal Procedure 41(a)(2)(C) defines a "federal law enforcement officer" as "a government agent (other than an attorney for the government) who is engaged *in enforcing the criminal laws* and is within any category of officers authorized by the Attorney General to request a search warrant."  FED. R. CRIM. P. 41(a)(2)(C) (emphasis added).  Clearly, a bankruptcy trustee does not satisfy the definition of a federal law enforcement officer under Federal Rule of Criminal Procedure 41 for the following three reasons: (1) a bankruptcy trustee is not an "agent" of the government; (2) a bankruptcy trustee is not "engaged in enforcing" the criminal laws; and (3) a bankruptcy trustee is not authorized by the Attorney General of the United States to request a search warrant.  Consequently, a bankruptcy trustee does not have the capability of applying for a search warrant under Federal Rule of Criminal Procedure 41. *See In re Application of Tr. in Bankr. for a Search Warrant*, 173 B.R. at 342 (holding that a bankruptcy trustee failed to satisfy the criteria for either an attorney for the government or a federal law enforcement officer under Federal Rule of Criminal Procedure 41; consequently the trustee failed to show "that he has the authority to apply for issuance of a search warrant").

Moreover, the request by a bankruptcy trustee for an order to search a debtor's residence for undisclosed property belonging to the bankruptcy estate also does not fall under the categories of persons or property subject to search or seizure under Federal Rule of Criminal Procedure 41.  Federal Rule of Criminal Procedure 41(c) specifically provides that a warrant may be issued for any of the following: "(1) evidence *of a crime*; (2) *contraband, fruits of crime*, or other items illegally possessed; (3) property designed for use, intended for use, or used *in committing a crime*; or (4) a person to be arrested or a person who is unlawfully restrained."  FED. R. CRIM P. 41(c) (emphasis added).  Under Rule 41(c), then, warrants are issued for purposes of uncovering evidence of a crime or criminal conduct.  Rule 41 is silent with respect to circumstances where an application is made to search property in the civil, as opposed to the criminal, context (and in particular the bankruptcy context).  By definition, therefore, a bankruptcy trustee cannot satisfy the conditions for the issuance of a search warrant under Federal Rule of Criminal Procedure 41.  This observation, however, does not mean that a bankruptcy court cannot issue an order permitting a bankruptcy trustee to search a debtor's residence within the confines of the Fourth Amendment to the United States Constitution.

> recognize as reasonable. The reduced expectation of privacy is a natural consequence of the substantial and detailed disclosures that are inherent in the bankruptcy process. Every debtor is required by 11 U.S.C. § 521[(a)](1) to file 'a list of creditors, . . . a schedule of assets and liabilities, a schedule of current income and expenditures, and a statement of financial affairs[.]' This requirement is also set forth in [Federal Rule of Bankruptcy Procedure] 1007(b)(1), which also requires that these disclosures be prepared as prescribed by the appropriate Official Forms. . . . Official Form 6, schedule B, requires every debtor to disclose the description and location, the ownership interests of spouses and the market value of thirty three listed types of personal property. These papers, with their highly detailed and personal disclosures, are routinely placed into court files that are available for inspection and copying by the public. It is fair to say that upon filing bankruptcy, a debtor's descriptions of his property are a matter of public record, conditioned only upon the extent of the debtor's honesty and detail. For Fourth Amendment purposes, these disclosures substantially reduce a debtor's reasonable expectation of privacy regarding his [or her] property interests.

*In re Barman*, 252 B.R. at 414 (citation and footnote omitted).

The statutory obligations imposed upon a debtor to disclose personal information and submit oneself to the bankruptcy process results in a reduced expectation of privacy in a debtor's property. *See U.S. v. Andujar*, 2006 U.S. App. LEXIS 31427, at *8 (3d Cir. Dec. 20, 2006) (citing *see In re Barman*, 252 B.R. at 414). However, a debtor does not forfeit all reasonable expectations of privacy upon filing a bankruptcy petition. As the *Barman* court recognized, some "considerations suggest that a debtor continues to have some reasonable expectation of privacy following the filing of a bankruptcy petition." *In re Barman*, 252 B.R. at 414. First, and most glaringly, "unlike the written and filed disclosures that are available to the public by law, an inspection of a debtor's home is not open to the public." *Id.* "Second, nothing in the Bankruptcy Code states or implies an obligation upon a debtor to permit an inspection by a trustee without a court order." *Id.* Stated differently, "[n]either the obligation to file written disclosures nor the obligation to appear at the creditors'

meeting relates at all to an inspection of a debtor's residence by the trustee." *Id.* The obligation of

a debtor to cooperate "has never been construed to require a debtor to allow an inspection without

a court order." *Id.* Third, the estate's interest in a debtor's personalty is limited, as "in almost all

cases this property reverts to the debtor through exemption very shortly after the case is filed." *Id.*

at 415.[21] This Court is mindful of the fact that in most instances, a search of a debtor's residence

can be highly intrusive due to the obvious fact that personal property of a small size may be hidden

anywhere in the debtor's residence. *See id* at 417-18.

At the other end of the spectrum, and balanced against a debtor's privacy interests, is the

strong public interest and policy in full, open, and proper administration of a bankruptcy case by a

trustee, including a thorough investigation of the debtor's assets. *See id.* at 417 (citing Dougherty

v. Capitol Cities Comm., Inc., 631 F. Supp. 1566, 1571 (E.D. Mich. 1986) (internal citation

omitted)). Without doubt, a debtor's honest and full disclosure is "'essential to the administration

of the bankruptcy estate.'" *Roudebush v. Sharp (In re Sharp)*, 244 B.R. 889, 891 (Bankr. E.D. Mich.

2000) (quoting *Cohen v. McElroy (In re McElroy)*, 229 B.R. 483, 488 (Bankr. M.D. Fla. 1998)).

"'The integrity of the entire bankruptcy system rests upon full and honest disclosure by debtors of

all of their assets.'" *In re Walker*, 323 B.R. 188, 198 (Bankr. S.D. Tex. 2005) (quoting *Rosenshein*

*v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996)); *see Schechter v. Hansen (In re Hansen)*, 325 B.R.

746, 757 (Bankr. N.D. Ill. 2005) (noting that "'the very integrity of the bankruptcy court and the

successful administration of the bankruptcy system rest upon compliance with the debtor's

obligation of disclosure'") (quoting *Urological Group, Ltd. v. Petersen (In re Petersen)*, 296 B.R.

766, 790 (Bankr. C.D. Ill. 2003)). To that extent, a debtor "who comes to the bankruptcy court must

---

[21] The application of this factor is limited here, as no exemption under the Bankruptcy Code envelopes the personalty found in the Debtor's residence.

come clean, make full disclosure of all information relevant to the administration, and must fully cooperate with the trustee." *U.S. Tr. v. Gardner (In re Gardner)*, 344 B.R. 663, 667 (Bankr. M.D. Fla. 2006) (citing *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir. 1971); *N. Trust Co. v. Garman (In re Garman)*, 643 F.2d 1252 (7th Cir. 1980)); *see also In re Wimpee*, 343 B.R. 845, 849 (Bankr. W.D. Ky. 2006) ("[T]he protection provided by the Bankruptcy Code was intended to aid the 'honest but unfortunate debtor.' *Cohen v. de la Cruz*, 523 U.S. 213 (1998).  As such, this [c]ourt expects debtors who seek such protection to deal with this [c]ourt, the [t]rustee, and all creditors with all candor."); *U.S. Tr. v. Halishak (In re Halishak)*, 337 B.R. 620, 624 (Bankr. N.D. Ohio 2005) (noting that "in exchange for receiving the benefits of a bankruptcy discharge, debtors are expected to fully, honestly and unconditionally cooperate with the bankruptcy process").

> [In short,] those who seek the shelter of the Bankruptcy Code [must] not play fast and loose with their assets or with the reality of their affairs.  The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction.

*Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987).

In carrying out his or her obligations under the Bankruptcy Code, a bankruptcy trustee may need to inspect a debtor's residence for potentially undisclosed assets to be administered for the benefit of the estate.  *See In re Barman*, 252 B.R. at 416 (citing *see In re Washington*, 232 B.R. 814 (Bankr. S.D. Fla. 1999)).  In some cases a trustee may have no alternative in carrying out his or her statutory obligations to marshal and account for all of the property of the estate without an inspection of the debtor's residence.  *See In re Barman*, 252 B.R. at 416-17.  Further, such an inspection and, if necessary, a seizure of assets, may become a "crucial part of the bankruptcy

process and therefore a matter of substantial need." *Id.* at 417 (footnote omitted).[22] Indeed, this case

and the fruits of the inspection present a perfect example.  Nonetheless, it must be noted that the

decision to permit a bankruptcy trustee to search a debtor's residence and seize any undisclosed,

hidden assets rightfully belonging to the bankruptcy estate is certainly not a decision that this Court

takes lightly or will permit to become commonplace.  Rather, this remedy is reserved only for rare

situations where a bankruptcy trustee presents the Court with specific, concrete, and compelling

reasons to justify such a procedure as well as convinces the Court that doing so is a matter of

substantial need.

The legality of a search of a debtor's residence by a bankruptcy trustee under the Fourth

Amendment depends upon the reasonableness, under all the circumstances, of the search itself.  *See*

*T.L.O.*, 469 U.S. at 341.  "[T]he reasonableness of any search involves a twofold inquiry: first, [a

court] must consider 'whether the . . . action was justified at its inception,' *Terry*, 392 U.S. at 20;

second, [the court] must determine whether the search as actually conducted 'was reasonably related

in scope to the circumstances which justified the interference in the first place,' *id.*"  *T.L.O.*, 469

U.S. at 341.

Here, the Court concludes that the Trustee's application for a search and seizure order and

injunction, the subsequent search of the debtor's residence, and seizure of the jewelry and artwork

was reasonable under the circumstances of this case.  First, based upon the record possessed by the

Trustee at the time she applied for the Order, the action was justified at its inception.  As the

exhaustive recitation of the undisputed facts make clear, the Trustee had the benefit of written

---

[22] This Court takes note of the language in *Barman* that to seize the items uncovered in a court-authorized search "presumably the trustee will follow the established procedures for such a seizure, which may involve an injunction."  *In re Barman*, 252 B.R. at 419.  Here, an injunction issued as part of the Order.

decisions by a state trial court and an appellate court concluding in no uncertain terms that the Debtor was neither honest nor credible and was believed to have retained possession of significant jewelry and artwork. Both the trial court and New Jersey Superior Court, Appellate Division explicitly rejected the Debtor's contention that the jewelry had been lost or stolen. Instead, both courts believed that the Debtor still possessed the jewelry and artwork and was lying about their whereabouts. In addition to the Debtor's deceitfulness before the state courts, during the entire course of the protracted divorce proceeding the Debtor displayed a cavalier disdain for the judicial process and repeatedly felt no compunction in violating court orders and disregarding rulings of the court. As noted, the Appellate Division opinion was rendered three months prior to the Debtor's bankruptcy filing. The strong conclusions reached by both courts regarding the Debtor's overall deceitfulness and disdain for the judicial process cannot be minimized. When the Debtor failed to list any jewelry or artwork on her bankruptcy petition and did not indicate any transfers of property in the year prior to filing her bankruptcy petition, the Trustee was abundantly justified in believing that a substantial need existed to search the Debtor's residence.

Two other factors militate in favor of the Trustee's actions. First, jewelry and artwork are easily transported and concealed. Equally significant is the fact that the Order entered by the Court went so far as to specifically describe and provide a value for the representative items of jewelry sought by the Trustee during the inspection. Given this Debtor's recalcitrance and demonstrated disregard for the judicial process, it was reasonable for the Trustee to believe the Debtor would either remove and further secrete the jewelry and artwork or simply disregard any turnover or inspection order if advance notice had been provided. Clearly, under the facts herein, if an

inspection was to be allowed, prior notice could not be given to this Debtor. Thus, the Court is satisfied that the *ex parte* Order was justified under these unusual and compelling circumstances.

Secondly, the Court concludes that the Trustee's search as conducted "'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *T.L.O.*, 469 U.S. at 341 (quoting *Terry*, 392 U.S. at 20). Again, because jewelry and artwork can be easily removed or hidden, it was reasonable and necessary for the Trustee to conduct an expansive search of the Debtor's residence.[23] Significantly, prior to conducting the search, the Trustee and United States Marshal provided the Debtor with no less than four opportunities to voluntarily produce any jewelry and artwork in her possession. The Debtor repeatedly denied having the articles. She even went so far as to claim she never possessed the jewelry itemized in the Order. These facts are not controverted by the Debtor. If the Debtor had chosen to be truthful, a search could have been completely avoided. Instead, the Debtor falsely denied possessing the jewelry. Finally, there is nothing in the record before the Court to contradict the Trustee's declaration that the United States Marshal's Service assisted the Trustee in an orderly and professional manner during the Trustee's search. As such, the Court concludes that the Trustee's search and seizure was reasonable under the Fourth Amendment and the total circumstances of this case.

Finally, because the Court concludes that the Trustee's conduct in obtaining a search and seizure order and then executing the order was reasonable, and thus not violative of the Debtor's Fourth Amendment rights under the United States Constitution, no basis exists to grant the Debtor's request to suppress the evidence discovered by the Trustee during the search. The Debtor's request to suppress the evidence must also be denied on an additional ground. Simply stated, the United

---

[23] There is no argument before the Court that the search exceeded its authorized scope.

States Supreme Court has "declined to extend the exclusionary rule to proceedings other than criminal trials." *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998) (citing *U.S. v. Leon*, 468 U.S. 897, 909 (1984); *U.S. v. Janis*, 428 U.S. 433, 447 (1976)); *see also U.S. v. Calandra*, 414 U.S. 338, 348 (1974) ("[S]tanding to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search.") (citations omitted).

III.    **Conclusion**

Based upon the foregoing, the order to show cause and request for preliminary injunction filed by the Trustee seeking authorization to enter and inspect the Debtor's residence for enumerated but undisclosed assets and, in turn, to seize those assets pending further order of this Court is hereby approved and granted.  The opposition filed by the Debtor seeking to suppress the evidence uncovered and seized by the Trustee as a result of her court-authorized search is hereby denied.

An Order in conformance with this Opinion has been entered by the Court and a copy is attached hereto.

/s/     *Donald H. Steckroth*
_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: April 10, 2007

## SCHEDULE A

The items recovered from the Debtor's residence consist of:

1)    a platinum diamond engagement ring, $18,000.00;
2)    an antique platinum and diamond aquamarine pin, $10,000.00;
3)    a white gold diamond and aquamarine ring, $400.00;
4)    a platinum and diamond pin, $2,500.00;
5)    an antique platinum diamond and sapphire pendant/pin, $20,000.00;
6)    a platinum and diamond bracelet, $15,000.00;
7)    an antique gold diamond and pink sapphire pin/pendant, $10,000.00;
8)    a yellow gold diamond tennis bracelet, $3,600.00;
9)    a yellow gold diamond necklace containing 133 diamonds, $18,000.00;
10)   an antique platinum diamond bracelet, $7,000.00;
11)   a white gold flexible diamond bracelet, $2,500.00;
12)   a white gold diamond bangle, $1,800.00;
13)   a platinum diamond bracelet, $14,000.00;
14)   a yellow gold enameled and diamond bangle bracelet, $1,650.00;
15)   a yellow and white gold diamond and ruby bracelet, $6,500.00;
16)   an antique sterling silver and rose gold pin, $3,000.00;
17)   a platinum diamond wedding band, $5,000.00;
18)   a yellow gold diamond pin, $200.00;
19)   a yellow gold diamond and pearl pin, $2,500.00;
20)   a white gold diamond and aquamarine pendant, $1,500.00;
21)   an antique sterling silver and rose gold pin, $8,000.00;
22)   a yellow gold ladies Cartier Panther Vendome watch, $3,500.00;
23)   a green and rose gold diamond and ruby pin, $2,500.00;
24)   a Bueche Girod ladies watch with diamond bezel, $3,000.00;
25)   a ladies Cartier gold Vermeil tank watch, $200.00;
26)   a ladies Corum watch with a mother of pearl dial, $6,000.00;
27)   a yellow gold diamond and ruby pin, $1,500.00;
28)   a ladies Ebel Beluga watch with diamond bezel, $4,500.00;
29)   a white gold and diamond necklace, $1,000.00;
30)   a ladies Geneva white gold watch, $2,500.00;
31)   a two strand fresh water pearl bracelet, $35.00;
32)   a yellow gold colored stone and diamond pin, $6,500.00;
33)   a pair of yellow gold diamond and pearl earrings, $2,500.00;

34) a yellow gold bracelet, $250.00;

35) a yellow gold diamond pearl and tourmaline pin, $750.00;

36) a pair of diamond earrings, $500.00;

37) a yellow and white gold diamond tear drop pendant, $1,800.00;

38) an antique diamond ring, $2,000.00;

39) a pair of yellow gold hanging pearl and diamond earrings, $1,500.00;

40) a three strand pearl necklace, $2,000.00;

41) a yellow gold diamond and African emerald pendant, $300.00;

42) a yellow gold necklace with diamond pendant, $350.00;

43) a pair of yellow gold pearl and diamond earrings, $6,000.00;

44) three yellow gold bangles, $330.00;

45) a yellow gold and diamond bracelet, $350.00;

46) a pair of yellow gold citrine topaz and amethyst earrings, $500.00;

47) a vintage white gold opal and diamond ring, $2,500.00;

48) a yellow gold pearl and diamond pin, $400.00;

49) a yellow and white gold ring, $350.00;

50) a platinum aquamarine and diamond pendant, $2,000.00;

51) a platinum diamond and sapphire ring, $1,000.00;

52) a platinum diamond wedding band, $500.00;

53) a Tahiti necklace with pearls, $100.00;

54) a pink coral yellow gold and diamond necklace, $750.00;

55) a pair of mens cufflinks, $125.00;

56) a yellow gold Venetian Intaglio colored stone bracelet, $425.00;

57) a sterling silver framed glass heart, $5.00;

58) a sterling silver/gold Vermeil and emerald bangle, $10.00;

59) a Boucheron ladies stainless steel watch, $500.00;

60) a yellow gold men's watch, $100.00;

61) a pair of gold earrings, $250.00;

62) six assorted yellow gold bangles, $1,500.00;

63) a yellow gold bangle bracelet, $700.00;

64) a white gold diamond pendant, $1,200.00;

65) a pearl stand bracelet, $1,000.00;

66) a pair of white gold diamond earrings, $900.00;

67) a yellow gold pearl colored stone pin, $300.00;

68) a white and yellow gold diamond pendant, $1,500.00;

69) a yellow gold and diamond ring, $1,000.00;

70) a pearl necklace, $100.00;

71) a yellow gold panther bracelet, $500.00;

72) a Corum boutique VI ladies stainless steel watch, $200.00;

73)   a yellow gold diamond and emerald heart, $500.00;

74)   a white gold necklace, $1,200.00;

75)   a yellow gold bangle (electro form figures), $250.00;

76)   a yellow gold diamond and green stone pendant, $110.00;

77)   a white gold pearl, diamond and stone pin, $1,500.00;

78)   a pair of yellow gold amethyst and diamond earrings, $350.00;

79)   a yellow gold ladies watch, $200.00;

80)   an antique yellow gold and diamond ring, $1,500.00;

81)   a yellow gold and diamond ring, $350.00;

82)   a yellow gold and diamond ruby ring, $250.00;

83)   a pair of yellow gold diamond colored stone earrings, $200.00;

84)   a pair of yellow gold diamond earrings, $200.00;

85)   a pair of white gold flower diamond and colored stone earrings, $500.00;

86)   a yellow gold diamond and colored stone ring, $150.00;

87)   an antique yellow gold diamond and pearl pin, $550.00;

88)   an antique gold pin, $500.00;

89)   an Elizabeth Arden gold tone compact, $10.00;

90)   a yellow gold and opal diamond ring, $85.00;

91)   a yellow gold pearl and diamond ring, $115.00;

92)   a yellow gold diamond and ruby ring, $140.00;

93)   yellow gold diamond and amethyst ring, $80.00;

94)   a white gold diamond and colored stone ring, $135.00;

95)   a yellow gold diamond heart pendant, $150.00;

96)   a white gold diamond and emerald pendant, $100.00;

97)   a vintage yellow gold diamond amethyst ring, $200.00;

98)   a yellow and white gold diamond and sapphire ring, $1,000.00;

99)   a yellow gold diamond ring, $1,000.00;

100)  a yellow gold chain, $125.00;

101)  a yellow gold pendant, $475.00;

102)  a yellow gold chain, $65.00;

103)  a yellow gold chain, $45.00;

104)  a yellow gold chain, $235.00;

105)  a yellow and white gold rope chain, $400.00;

106)  a yellow gold chain, $95.00;

107)  a yellow gold chain with small heart, $215.00;

108)  a yellow gold chain, $45.00;

109)  a yellow gold chain, $35.00;

110)  a tri-color necklace, $100.00;

111)  a yellow gold snake chain, $105.00;

112)  a yellow gold chain, $40.00;

38

113)   a yellow gold chain, $35.00;

114)   a white gold diamond Star of David, $135.00;

115)   a yellow gold and colored stone pendant with chain, $35.00;

116)   a yellow gold and tourmaline pendant with chain, $100.00;

117)   a white gold diamond pendant, $500.00;

118)   a vintage yellow gold amethyst, turquoise, and pearl pin, $500.00;

119)   a yellow gold bangle, $165.00;

120)   a yellow gold bangle, $40.00;

121)   a sterling silver and gold plated bangle, $5.00;

122)   a gold tone mesh bag, $5.00;

123)   a yellow gold and green emerald pendant/pin, $125.00;

124)   two yellow gold framed cameos, $200.00;

125)   a yellow gold amethyst pendant, $40.00;

126)   three yellow gold enameled and colored stones, $100.00;

127)   a yellow gold diamond pendant, $100.00;

128)   two yellow gold pendants, $95.00;

129)   a pair of yellow gold tourmaline and pearl earrings, $45.00

130)   a pair of yellow gold hoop earrings, $100.00;

131)   a pair of yellow gold hoop earrings, $15.00;

132)   sixteen pairs of yellow gold earrings, $900.00;

133)   a yellow gold bracelet, $140.00;

134)   a yellow gold bracelet, $250.00;

135)   a yellow gold bracelet, $100.00;

136)   a yellow gold bracelet, $290.00;

137)   a yellow gold bracelet, $135.00;

138)   a yellow gold bracelet, $185.00;

139)   a yellow gold bracelet, $110.00;

140)   a yellow gold bracelet, $115.00;

141)   a yellow gold bracelet, $110.00;

142)   a yellow gold tri-color bracelet, $90.00;

143)   a yellow gold bracelet, $25.00;

144)   two yellow gold garnet and peridot bracelets, $150.00;

145)   a yellow gold diamond and emerald bracelet, $110.00;

146)   a yellow gold and colored stone bracelet, $140.00;

147)   a sterling silver and gold plated bracelet, $2.00;

148)   a yellow gold diamond bracelet, $300.00;

149)   a yellow gold bar pin, $300.00;

150)   a yellow gold bar pin, $200.00;

151)   a yellow gold diamond and peridot heart pendant, $150.00;

152)   a yellow gold coin ring, $75.00;

153)   a yellow gold friendship ring, $100.00;

154)   a yellow gold ring, $80.00;

155)   a white gold pearl and diamond ring, $125.00;

156)   a yellow gold diamond and emerald ring, $175.00;

157)   a yellow gold and enameled ring, $60.00;

158)   a yellow gold and rhodalite garnet ring, $55.00;

159)   a yellow gold diamond ring, $75.00;

160)   a tri-band ring, $35.00;

161)   a yellow gold diamond and emerald ring, $300.00;

162)   a yellow gold chain, $10.00;

163)   a framed Francisco Zuniga lithograph, $1,500.00;

164)   a gilt framed oil painting, $50.00;

165)   a framed Francisco Zuniga offset reproduction, $50.00;

166)   a framed Marc Chagall lithograph, $400.00;

167)   a framed Francisco Zuniga offset reproduction, $50.00;

168)   a framed Hirschfeld lithograph, $350.00;

169)   a framed Francisco Zuniga offset reproduction, $50.00;

170)   a gilt framed oil painting, $50.00; and

171)   two Salvador Dali framed lithographs, $300.00.